IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ON COMMAND VIDEO CORPORATION,   )
                                )
        Plaintiff/Counter-Defendant,   )   No. 09 C 3130
    v.                          )
                                )   Judge Robert W. Gettleman
SAM ROTI,                       )
                                )
        Defendant/Counter-Plaintiff   )

## MEMORANDUM OPINION AND ORDER

Plaintiff/Counter-Defendant On Command Video Corporation has filed a two-count complaint against Defendant/Counter-Plaintiff Sam Roti alleging fraud and, under a theory of piercing the corporate veil, seeking enforcement of a default judgment entered in Colorado state court against Markwell Properties, LLC ("MP")—of which defendant is allegedly the alter ego—and registered in the Circuit Court of Cook County, Illinois.

In its April 30, 2010, opinion, the court granted plaintiff's motion to dismiss defendant's counterclaims for fraudulent inducement and breach of contract, and struck defendant's first, second, third, fifth, and sixth affirmative defenses.[1] The parties have filed cross-motions for summary judgment on both counts. For the reasons discussed below, defendant's motion for summary judgment is denied, and plaintiff's motion for summary judgment is denied as to Count I and granted as to Count II.

---

[1] Defendant raised seven affirmative defenses: (1) unclean hands, (2) fraud, (3) estoppel, (4) failure to mitigate damages, (5) waiver, (6) assumption of risk, and (7) failure to state a claim.

Defendant has also filed a motion to strike improper affidavits and exhibits.[2] The disputed evidence is not dispositive in deciding the motions for summary judgment. As such, the court does not rule on the motion to strike.

## FACTS

In considering a motion for summary judgment, the court draws "all reasonable inferences from undisputed facts in favor of the nonmoving party and [views] the disputed evidence in the light most favorable to the nonmoving party." Harney v. Speedway SuperAmerica, LLC, 526 F.3d 1099, 1104 (7th Cir. 2008). The following facts are taken from the complaint and from the parties' statements of facts and accompanying exhibits as to which there is no material dispute.

Plaintiff provides pay-per-view and on-demand video services to hotels and other venues. MP was formed as an Illinois limited liability company in November 1999. From inception until December 2004, MP had two member-owners, defendant and his cousin Michael Roti. In MP's Articles of Organization, Michael was listed as the registered agent and signed as an "organizer." In 2002, defendant also formed Markwell Hillside, LLC ("MH"), through which he purchased Holiday Inn Hillside ("the Hotel") located at 4400 Frontage Road, Hillside, Illinois. Defendant was the sole managing member and officer of MH.

In 2004, MP contracted with DC Truck Financial, a subsidiary of Daimler-Chrysler, for a lease to supply vans to the Hotel (the "Van Lease"). MH made the payments on the Van Lease.

---

[2]Defendant moved to strike the affidavits of David Redpath and Michael Cyran, submitted by plaintiff in its reply brief. Redpath's affidavit supports plaintiff's arguments that: defendant backdated his signature on the Video Services Agreement ("VSA," discussed below) to distance it in time from the bankruptcy Markwell Hillside LLC's; Redpath was not present when defendant signed the VSA; and plaintiff was not told that MP was the owner of the Hotel during negotiations of the VSA. In his affidavit, Cyran describes the Hotel's commissions and the invoices sent to Holiday Inn Hillside.

With respect to the Hotel, plaintiff had an existing contract with its previous owners, and MH assumed this contract when it purchased the Hotel. Plaintiff sent invoices to the "Holiday Inn Hillside," and MH remitted payment to plaintiff. MP did not make payments to plaintiff.

David Redpath became plaintiff's Regional Sales Manager for the Midwest in 2003. In or about November 2004, Redpath and William Patterson, MH's manager, met to discuss plaintiff's new digital platform. Paterson testified that they discussed a change in equipment for the Hotel, and that Redpath said he would prepare the necessary paperwork to this end.

After submitting paperwork to plaintiff's Contracts Department, Redpath learned that the ownership group and management company on the paperwork were incorrect. Subsequently, Redpath contacted Patterson to obtain updated ownership information. Although Redpath does not recall the conversation, Patterson testified that he thought the problem was with MH as party—namely the Hotel's bad credit and history of late payments to plaintiff. Patterson further testified that Redpath asked if there was "any other way—or any other facility...another avenue that we could use at that time." Redpath, however, has no recollection of asking for another facility in this manner and denies he would have done so. At most, Redpath stood to earn about $203.00 for the deal. Redpath testified that he would not have sought to use an entity without regard to its ownership status. Plaintiff argues that Redpath sought only ownership information to confirm that plaintiff was contracting with the Hotel's owner.

According to Patterson's testimony, he met with Redpath and defendant after the revised paperwork was approved by Redpath's supervisor. Patterson stated that he told Redpath that defendant did not want to be personally liable on any contract with plaintiff, and Redpath assured Patterson that plaintiff would not hold defendant personally liable. Redpath, however, testified that he was "certain" that he had never met defendant prior to Redpath's deposition in

March 2010. He further testified that it was not possible that he would have "assured [defendant] that OCV would not hold him personally liable" because he had "neither the authority nor the knowledge to know the answer to that question."

On December 28, 2004,[3] defendant signed a video services agreement ("the VSA") with plaintiff through August 16, 2012, as "Member" and "Registered Agent" of MP. Plaintiff signed the VSA on February 4, 2005. No personal guaranty was signed. Defendant alleges that he did not review the text of the VSA before signing it. The VSA states that MP owns the Hotel.

In February 2005, MH filed for Chapter 11 bankruptcy. The bankruptcy trustee terminated defendant from MH. The new owner of the Hotel continued to pay plaintiff until the owner terminated its services. In January 2007, plaintiff sent a letter to MP seeking damages for lost profits.

In the Denver County District Court in Colorado, a default judgment for breach of contract was entered on October 16, 2007, against MP in the sum of $261,058.31. On September 17, 2008, plaintiff registered the Colorado judgment in the Circuit Court of Cook County, Illinois. Plaintiff brought the instant case to hold defendant personally liable for the judgment.

## DISCUSSION

**Legal Standard**

Summary judgment is appropriate if the evidence demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Village Church v.

---

[3] The date legend at the bottom of each page of the VSA is January 10, 2005. The court does not find this discrepancy material.

Village of Long Grove, 468 F.3d 975, 988 (7th Cir. 2006). The burden is on the moving party to identify portions of the pleadings, answers to interrogatories, and affidavits that demonstrate an absence of material fact. See Celotex, 477 U.S. at 323 (1986). The burden then shifts to the nonmoving party to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

When reviewing a summary judgment motion, the court must read the facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court's role "is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 443 (7th Cir. 1994).

## Analysis

**Fraud (Count I)**

To establish an Illinois fraud claim, "the plaintiff must prove by clear and convincing evidence that: (1) the defendant made a false statement of material fact; (2) the defendant knew or believed that the statements were false, or the statements were made with a reckless disregard of whether they were true or false; (3) the statements were made with the intent to induce action; (4) the plaintiff reasonably believed the statements and justifiably acted in reliance on those statements; and (5) the plaintiff suffered damages as a result." Kapelanski v. Johnson, 390 F.3d 525, 530-31 (7th Cir. 2004) (citing Soules v. Gen. Motors Corp., 79 Ill. 2d 282, 286 (1980)).

In the instant case, defendant argues that plaintiff has failed to offer evidence that proves a false statement of material fact, that the statements were made with the intent to defraud, reasonable reliance on those statements, and that plaintiff suffered damages. Plaintiff naturally

disagrees. The record reveals several contested issues of material fact precluding summary judgment.

Defendant argues that he made no affirmative misstatement and that plaintiff's fraud claim turns on a provision in the VSA—that the signing party owned the Hotel—defendant never read. As plaintiff notes, however, a party may not avoid responsibility for signing a document by claiming he did not read the document. See, e.g., F.T.C. v. IFC Credit Corp., 543 F. Supp. 2d 925, 946-47 (N.D. Ill. 2008). Defendant further argues that Redpath knew that MH owned the Hotel, information that defendant did not attempt to hide as evidenced by the monthly checks from MH. Specifically, Patterson testified that he made clear to Redpath that MP was not the owner of the Hotel, and Patterson (not defendant) came up with the idea of using MP for the VSA. Plaintiff disputes these facts, and argues that during his deposition Patterson did not recall telling Redpath that MP was not the owner of the Hotel, despite attempts to exhaust his recollection on that meeting. Rather, this information was part of his summary judgment affidavit.

The court also finds contested issues of material fact with respect to what was said in a subsequent, final meeting (and even who was in attendance at that meeting). Although Redpath is certain he did not meet defendant prior to March 2010, Patterson describes a meeting at which he, Redpath, and defendant discussed the Hotel's ownership and defendant's potential liability under the VSA. Specifically, Patterson stated that they agreed defendant would not be personally liable on any contract with plaintiff. What was actually said to plaintiff about who owned the Hotel and potential liability is unclear.

Moreover, the record does not make apparent why actual ownership of the Hotel was or was not important to plaintiff. Both citing Cyran's deposition, the parties dispute the materiality

of the ownership provisions. Defendant argues that Cyran thought the Hotel's ownership was "perhaps not an important piece of information," while plaintiff points to other testimony:

> Q: Why do you care which entity owned the hotel?
>
> A: Because there's some assets behind the—well, actually for a variety of reasons. One is, we need to be comfortable that the entity purporting to commit itself to obligations with respect to the hotel has the authority to do so. We believe that the owner in most cases would have the authority to do so, so that's important to us. And the second is that we need to know that the entity signing the contract has some assets.

Plaintiff supports its argument with the testimony of Redpath and Barbara Seavy,[4] plaintiff's contracts manager, tending to show that they believed the Hotel's ownership information was important. Defendant argues, however, that plaintiff never communicated with MP or the owner, all invoices were sent to the Hotel itself, and plaintiff readily accepted checks from MH.

Whether a party has reasonably relied on a statement is generally a question for the trier of fact. See, e.g., Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc., 250 F.3d 570, 574 (7th Cir. 2001) ("Although reliance is normally a question of fact, it can be determined as a matter of law when no trier of fact could find that it was reasonable to rely on the alleged statements or when only one conclusion can be drawn."). In the instant case, the court cannot find as a matter of law that plaintiff did or did not reasonably rely on any misrepresentation—in particular, that

---

[4]Plaintiff also refers to an email written by Seavy which show that she was unaware that MP was not the owner of the Hotel. She explained the email in her deposition:

> The agreement must have been with [MP], who would have been the owner entity for that agreement, and I know our goal was to find who the owner—who the current owner would have been, so it looks like I'm wondering how [MH] was involved and when. I'm wondering how they became the owner if they were not listed on the agreement.

MP was the owner of the Hotel. Moreover, it is not clear why defendant should not be held liable for signing a contract he knew named the wrong entity, MP, as owner of the Hotel.

The court concludes that contested issues of material fact preclude summary judgment. With respect to Count I, defendant's motion for summary judgment is denied and plaintiff's motion for summary judgment is denied.

**Alter Ego (Count II)**

Generally, parties related to a corporation are not liable for corporate debts. See Dimmitt & Owens Fin., Inc. v. Superior Sports Prods., Inc., 196 F. Supp. 2d 731, 738 (N.D. Ill. 2002). An exception to this rule applies when an "individual or entity uses a corporation merely as an instrumentality to conduct that person's or entity's business." Fontana v. TLD Builders, Inc., 362 Ill. App. 3d 491, 500 (2d Dist. 2005). A plaintiff may pierce the corporate veil of limited liability where: (1) there is such a unity of interest and ownership that the separate personalities of the corporations cease to exist; and (2) adherence to the fiction of a separate existence would sanction a fraud or promote injustice. Hystro Prods., Inc. v. MNP Corp., 18 F.3d 1384, 1388-89 (7th Cir. 1994); Van Dorn Co. v. Future Chemical and Oil Corp., 753 F.2d 565, 569-70 (7th Cir. 1985). "Courts are reluctant to pierce the corporate veil. Accordingly, a party seeking to pierce the corporate veil has the burden to make a substantial showing that the corporation is really a dummy or sham for another dominating entity." Jacobson v. Buffalo Rock Shooters Supply, Inc., 278 Ill. App. 3d 1084, 1088 (3d Dist. 1996) (citations omitted).

To determine whether the "unity of interest and ownership" between an individual and a corporation is such that the corporate fiction should be disregarded, courts consider the following factors: "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) non-

functioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a shareholder; (10) failure to maintain arm's length relationships among related entities; and (11) whether the corporation is a mere facade for the operation of the dominant shareholders." Dimmitt, 196 F. Supp. 2d at 738; see also Fontana, 362 Ill. App. 3d at 503; accord Hystro, 18 F.3d at 1389. The court must decide whether these factors, taken as a whole, demonstrate that the corporation is actually the alter ego of the individual. No one factor is determinative. Dimmitt,196 F. Supp. 2d at 738. In its supporting brief, plaintiff argues that all of these factors are present.

*Inadequate capitalization*

"A court will find a corporation to be undercapitalized only when it has so little money that it could not and did not actually operate its actual business as its own." Wachovia Securities, LLC v. Jahelka, 586 F. Supp. 2d 972, 991 (N.D. Ill. 2008) (citations omitted). Defendant argues that MP's shareholders pledged capital, the adequacy of which is shown by the fact MP did business for several years. The parties agree that MP had $1,000 capital, and defendant argues that $1,000 was sufficient because MP's officers worked without pay and no party expected MP to pay for the VSA.

Defendant testified that the capital contributions were made for annual filing fees. MP's obligations under the Van Lease, however, far exceeded $1,000. The monthly payments alone were over $3,000. Even assuming MP did not need additional capital for its officers and the VSA, MP was not adequately capitalized with respect to the filing fees and the Van Lease. Defendant's testimony suggests that this was intentional; MP signed the Van Lease to "keep the transportation department separate from the hotel" and to "avoid a situation where one of the van drivers got into an accident and was able to sue [MH]." Moreover, defendant's argument that

MP's years in business show that it was properly capitalized is not persuasive. As plaintiff notes, this logic would prevent any non-dissolved corporation from being deemed undercapitalized.

Other than the $1,000 of capital on MP's 1999 tax filings, defendant did not produce other tax filings or documents showing bank accounts or lines of credit. Defendant testified that no payments or income went to MP or himself for the benefit of MP. Plaintiff thus has proven that MP was inadequately capitalized at its formation.

*Failure to issue stock; Failure to observe corporate formalities*

The court does not find that MP's failure to issue stock is material. Defendant's failure to produce an operating agreement or other evidence regarding the movement of income or profits, however, does not support the notion that MP had a bona fide corporate purpose.[5] This purpose is not clarified by the absence of annual reports, tax returns, and other records of business activities. In Wachovia, 586 F. Supp. 2d at 1000, the court held that the failure to prepare and maintain corporate records evidenced a failure to observe corporate formalities.

*Nonpayment of dividends; Insolvency of the debtor corporation*

MP did not pay dividends or make other distributions. With respect to insolvency, defendant argues that there is no evidence that MP's liabilities exceeded its assets prior to its dissolution. As discussed, MP's capital was insufficient to cover the filing fees and the Van Lease, and the evidence does not show bank accounts or income. MP dissolved shortly after plaintiff sued MP. Even though the subsequent Colorado judgment was not among MP's liabilities at the time of its dissolution, MP was insolvent at all relevant times.

---

[5]Defendant states that MP's purpose was to develop the Motor Club building in downtown Chicago. The evidence suggests, however, that MP was actually a management company, even though it did not collect rent or other income.

*Non-functioning of the other officers or directors*

In addition to defendant, his cousin Michael Roti and brother Joe Roti are identified by defendant as connected to MP. In particular, defendant states that "Michael played a full role as co-owner during the approximately five years that he was part of MP." The record, however, does not reveal any evidence that Michael (or anyone else for that matter) functioned as an officer or director. That is, only defendant appears to have had control or managerial authority. Defendant characterized Michael as MP's unpaid employee who worked on development deals prior to the events relevant to the instant case. For all practical purposes, defendant was the sole co-owner with control and managerial authority over MP.

*Absence of corporate records; Commingling of funds; Diversion of assets from the corporation by or to a shareholder*

The court has addressed corporate records, and defendant does not refute their absence. With respect to commingling, plaintiff argues that defendant commingled MP's and MH's funds. Under the VSA, MP was entitled to a commission on the fees charged to hotel guests for viewing movies. Plaintiff received payments from MH for its services, and MP should have received its commission. Yet there is no evidence of any income to MP.

Defendant responds that MP neither gave funds to nor received funds from MH. But MH received the fees charged to hotel guests and, thus, MH should have paid MP its commission. This arrangement would not be commingling, since MP would have been entitled to a portion of MH's income. MH's retention of these funds would be commingling. If MH did not commingle by retaining MP's commission, then it was diverted elsewhere—presumably to defendant. This arrangement would certainly suggest a "unity of interest and ownership." Regardless, MP did not receive income that may have satisfied potential liabilities.

*Failure to maintain arm's length relationships among related entities*

The court's discussion of commingling and diversion of assets reflects MP's failure to maintain arm's length relationships. The parties' briefs largely focus on MP's assertion that it had office space in the Motor Club Building. Prior to the VSA, MP allegedly rented office space from defendant at no cost under an oral lease. Moreover, under the Van Lease, MH leased vans from defendant at no cost. These facts establish a failure to maintain arm's length relationships.

*Whether the corporation is a mere facade for the operation of the dominant shareholders*

Defendant does not explicitly address this factor. The record reveals that MP was a mere facade for defendant for all of the reasons discussed above. MP's inadequate capitalization, failure to observe corporate formalities, nonpayment of distributions, and insolvency call into question its corporate purpose. MP's lack of other officers or directors and absence of corporate records indicate a lack of business activities. Its commingling, diversion of assets, and failure to maintain arm's length relationships establish that defendant used MP for his sole benefit. The court concludes that there is a unity of interest and ownership such that MP's separate personality did not exist.

To pierce the corporate veil, plaintiff must also show that adherence to the fiction of a separate existence would sanction a fraud or promote injustice. In defendant's supporting brief, he argues that there is no fraud or injustice because Count I should be decided in his favor. As discussed, the record does not support such a finding. Citing Fusion Capital Fund II, LLC v. Ham, 2010 WL 2990817 (7th Cir. Aug. 2, 2010) (applying Nevada law), defendant also argues that plaintiff's knowledge that MH owned the Hotel and acceptance of performance from MH preclude a finding of fraud and injustice.

In <u>Wachovia</u>, 586 F. Supp. 2d at 1012 (citations omitted), the court explained:

> [A plaintiff] must point to more than the mere prospect of an unsatisfied judgment and must show that some wrong beyond a creditor's inability to collect will result if the veil is not pierced, such as the individuals being unjustly enriched or unfairly avoiding liability after draining corporate assets. Actual fraud is not a necessary predicate to piercing the corporate veil; limited liability may be discarded to prevent injustice or inequitable consequences. One example of inequitable conduct that justifies veil piercing: a corporate owner who used his several corporations to avoid responsibilities to creditors.

In the instant case, although issues of fact preclude a determination whether actual fraud occurred, plaintiff has established that piercing the corporate veil would prevent injustice or inequitable consequences. Defendant used MP to avoid contractual responsibilities, specifically those in the Van Lease and the VSA. In a clear example of attempting to unfairly to avoid liability, MP signed the Van Lease to "keep the transportation department separate from the hotel" and to "avoid a situation where one of the van drivers got into an accident and was able to sue [MH]." The evidence shows a similar situation with respect to the VSA. MP was inadequately capitalized and lacked a corporate identity. Its indeterminate purpose and business activities as well as the improper treatment of funds also show that MP would unfairly avoid liability if the corporate veil was not pierced.

The court concludes that adherence to the fiction of a separate existence would sanction a fraud or promote injustice. With respect to Count II, defendant's motion for summary judgment is denied and plaintiff's motion for summary judgment is granted.

## **CONCLUSION**

For the reasons discussed above, defendant's motion for summary judgment is denied, and plaintiff's motion for summary judgment is denied as to Count I and granted as to Count II. Plaintiff is directed to prepare a draft judgment order consistent with this opinion to be filed by January 14, 2011, and presented on January 20, 2011, at 9:00 a.m.
.


**ENTER:** **January 3, 2011**

_____
**Robert W. Gettleman
United States District Judge**